COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION: 1 1
CASE NO.: L9-CL-941

FILED

SEP 13 2019

FRANKLIN CIRCUIT COURT
AMY FELDMAN, CLERK

CITY OF HENDERSON, KENTUCKY,
ON BEHALF OF THEMSELVES AND
ALL OTHER SIMILARLY SITUATED
HOME RULE CITIES,

          PLAINTIFFS,

v.

PURDUE PHARMA L.P.; PURDUE
PHARMA INC.; PURDUE FREDERICK
COMPANY; RHODES
TECHNOLOGIES; RHODES
TECHNOLOGIES INC.; RHODES
PHARMACEUTICALS L.P.; RICHARD
SACKLER; BEVERLY SACKLER;
DAVID SACKLER; ILENE SACKLER
LEFCOURT; JONATHAN SACKLER;
KATHE SACKLER; MORTIMER D.A.
SACKLER; THERESA SACKLER;
ABBOTT LABORATORIES; ABBOTT
LABORATORIES, INC.; TEVA
PHARMACEUTICAL INDUSTRIES,
LTD.; CEPHALON, INC.; TEVA
PHARMACEUTICALS USA, INC.;
ALLERGAN PLC; ACTAVIS PLC;
WATSON PHARMACEUTICALS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS PHARMA, INC.; ACTAVIS
LLC; ENDO HEALTH SOLUTIONS
INC.; ENDO PHARMACEUTICALS
INC.; ENDO INTERNATIONAL PLC;
PAR PHARMACEUTICAL, INC.; PAR
PHARMACEUTICALS COMPANIES,
INC.; MALLINCKRODT PLC;
MALLINCKRODT LLC; SPECGX LLC;
JOHNSON & JOHNSON; JANSSEN
PHARMACEUTICALS, INC.;
NORAMCO, INC.; AMNEAL
PHARMACEUTICALS, LLC; AMNEAL
PHARMACEUTICALS, INC.; MYLAN

CLASS ACTION COMPLAINT

*JURY TRIAL REQUESTED*

PHARMACEUTICALS, INC.; WEST-
WARD PHARMACEUTICALS CORP.;
KVK TECH, INC.; ASSERTIO
THERAPEUTICS, INC.; DEPOMED
INC.; AMERISOURCEBERGEN DRUG
CORPORATION; H. D. SMITH, LLC;
ANDA, INC.; CARDINAL HEALTH,
INC.; CVS HEALTH CORPORATION
LLC; MCKESSON CORPORATION;
RITE AID CORPORATION; SMITH
DRUG COMPANY, INC.; KENTUCKY
CVS PHARMACY LLC; FRED'S
STORES OF TENNESSEE, INC.;
KROGER COMPANY; RITE AID OF
KENTUCKY, INC.; WALGREEN CO.;
WALMART INC.,

              **DEFENDANTS.**

# TABLE OF CONTENTS

Procedural Statement ........................................................................................... 1

Introduction ........................................................................................................ 1

    A.    Kentucky's Opioid Crisis—Epidemic. ................................................. 1

    B.    The National Opioid Crisis—Epidemic. .............................................. 5

    C.    This Lawsuit and the Plaintiffs'—Kentucky Home Rule Cities—Claims. ....... 6

        1.    The Opioid Manufacturers. ....................................................... 7

        2.    The Distributors and Pharmacies– the Suppliers. ...................................... 9

Jurisdiction & Venue ......................................................................................... 10

Parties .............................................................................................................. 11

    A.    Plaintiffs—Kentucky Home Rule Cities. ........................................... 11

    B.    Defendants. ................................................................................ 12

        1.    Manufacturing ("Marketing") Defendants .................................... 13

            a.    Purdue Entities. ............................................................. 13

            b.    Rhodes Entities. ............................................................. 14

            c.    Sackler Defendants. ........................................................ 16

            d.    Abbott Entities. ............................................................. 21

            e.    Teva Entities. ................................................................ 23

            f.    Allergan Entities. ........................................................... 25

            g.    Endo Entities. ............................................................... 27

            h.    Mallinckrodt Entities. ..................................................... 28

            i.    Johnson & Johnson Entities. ............................................. 30

            j.    Amneal Entities. ............................................................ 33

            k.    Mylan. ........................................................................ 33

            l.    West-Ward. .................................................................. 34

m.    KVK-Tech............................................................................ 34

n.    Assertio Entities. ............................................................... 35

2.    Wholesale Distributor Defendants. ............................................. 35

a.    AmerisourceBergen Entities ............................................. 36

b.    Anda. ..................................................................................... 37

c.    Cardinal Health. .................................................................. 37

d.    CVS. ....................................................................................... 38

e.    Kroger. .................................................................................. 38

f.    McKesson. ............................................................................. 39

g.    Rite Aid Corp. ...................................................................... 40

h.    Smith Drug. .......................................................................... 40

i.    Walgreens. ............................................................................ 40

j.    Walmart................................................................................ 41

3.    Retail Pharmacy Defendants....................................................... 41

a.    CVS Pharmacy...................................................................... 42

b.    Fred's Stores. ....................................................................... 42

c.    Kroger. .................................................................................. 42

d.    Rite Aid KY. ......................................................................... 43

e.    Walgreens. ............................................................................ 43

f.    Walmart................................................................................ 43

**Factual Background**.................................................................................. **44**

A.    **The Opioid Epidemic.**......................................................................... **44**

1.    The National Opioid Epidemic. ................................................... 44

2.    Kentucky's Opioid Epidemic........................................................ 48

**B.**     **The Manufacturer ("Marketing") Defendants' False, Deceptive, and Illicit Marketing of Opioids.** ................................................................................. **49**

    1.    The Manufacturer ("Marketing") Defendants Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids .......... 52

       a.    Direct Marketing. ........................................................................ 53

       b.    Indirect Marketing. .................................................................... 55

    2.    The Manufacturer ("Marketing") Defendants' Coordinated Marketing Scheme Misrepresented the Significant Risks of Opioids. ...................... 67

       a.    The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs. ...................................................................... 67

       b.    The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs. .................... 77

    3.    The Manufacturer ("Marketing") Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations. ..................................... 83

    4.    The Manufacturer ("Marketing") Defendants made Materially Deceptive Statements and Concealed Material Facts. .............................................. 84

    5.    The Manufacturer ("Marketing") Defendants Fraudulently Concealed Their Misconduct. ...................................................................................... 91

**C.**     **The Wholesale Distributor Defendants' Unlawful Sale and Distribution of Opioids.** ........................................................................................................ **94**

    1.    Wholesale Distributor Defendants' Have a Duty to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders. .................................................................................................................... 95

    2.    The Wholesale Distributor Defendants Breached their Legal Duties ..... 102

    3.    The Wholesale Distributor Defendants Actively Avoided, and Willfully Misrepresented their Compliance with, their Legal Duties. ................... 104

**D.**     **The Manufacturer ("Marketing") Defendants Unlawful Failure to Prevent Diversion and Failure to Monitor, Report, and Prevent Suspicious Orders.** ........................................................................................................................ **111**

E.     All Defendants Engaged in Unlawful Conduct and Breached their Legal Duties thereby Causing the Harm and Substantial Damages Alleged Herein. ...................................................................................................... 114

F.     The Retail Pharmacy Defendants Were on Notice of and Contributed to the Illegal Diversion of Prescription Opioids...................................... 116

    1.     The Retail Pharmacy Defendants Have a Duty to Prevent Diversion. ... 118

    2.     Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms their Compliance Failures. ....................................... 121

        a.     CVS........................................................................... 122

        b.     Walgreens. ................................................................ 124

        c.     Rite Aid.................................................................... 126

G.     The Opioid ("Marketing") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids. ....... 128

    1.     The Opioid Conspiracy's Purpose—Increased Sales & Profit. .............. 128

    2.     The Opioid Marketing Conspiracy. ....................................... 133

    3.     The Opioid ("Marketing") Defendants Controlled and Paid Front Groups and KOLs to Promote and Maximize Opioid Use. ................................. 138

    4.     Additional Evidence of the Opioid Conspiracy. ...................................... 138

H.     The Manufacturer and Distributer ("Opioid Supply") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids. ................................................................. 141

Class Allegations ............................................................................... 152

Claims for Relief ............................................................................... 155

    A.     Public Nuisance (All Defendants). ......................................... 155

    B.     Negligence (All Defendants). ................................................ 164

    C.     Negligence Per Se—Statutory Reporting Violation (All Defendants). .......... 166

    D.     Negligence Per Se-- False Advertising Violation (Opioid ("Marketing") Defendants and Opioid Supply Defendants). ................................................ 168

    E.     Negligent Misrepresentation (All Defendants). ............................. 169

F.   Civil Conspiracy (Opioid ("Marketing") Defendants). .................................. 171

G.   Civil Conspiracy (Opioid Supply Defendants). ............................................... 172

H.   Consumer Protection (All Defendants). ............................................................ 173

I.   Fraud by Omission (All Defendants). ................................................................ 175

J.   Unjust Enrichment (All Defendants). ............................................................... 176

K.   Punitive Damages (All Defendants). ................................................................. 177

Prayer for Relief .................................................................................................................. 180

## PROCEDURAL STATEMENT

1.      The headings contained in this Class Action Complaint are intended only to assist in reviewing the statements and allegations contained herein.  To avoid the unnecessary repetition in each section, the Plaintiffs affirm and incorporate each paragraph in each section of this Class Action Complaint as though fully set forth therein.

2.      Despite its length, the factual allegations contained in this Class Action Complaint are *not exhaustive* and are presented throughout this Class Action Complaint solely to provide the Defendants with the requisite notice of the basis for the Plaintiffs' allegations and claims. The Plaintiffs expressly reserve the right to plead additional facts where and as necessary to ensure complete relief.  Further, pursuant to CR 15.02, this Class Action Complaint should be deemed to conform with the evidence on which the Plaintiffs' claims are ultimately tried.

## INTRODUCTION

### A.      Kentucky's Opioid Crisis—Epidemic.

3.      No state has been hit harder by the opioid epidemic than Kentucky. The opioid epidemic poses an ongoing crisis in Kentucky. The rate of overdose deaths involving opioid prescriptions in Kentucky rose steadily from 1.0 deaths per 100,000 persons in 1999 to 10.2 deaths per 100,000 persons in 2017.

4.      According to the CDC, in 2015, Kentucky shared the 2nd highest overdose rate in the country. Data from 2013 onward shows that Kentucky has the 3rd highest drug overdose mortality rate in the country. Between 2012 and 2016, drug overdoses caused a total of 5,822 deaths in Kentucky. In 2017, there were 1,565 fatal drug overdoses in Kentucky, which is an increase to approximately 130 deaths per month. According to the National Institute on Drug Abuse, Kentucky has double the overdose rate of the national average. Drug overdoses have

become the leading cause of accidental death in Kentucky.

5.      In 2015, 102 opioid prescriptions were written for every 100 Kentucky residents, which was 1.5 times the national average. Kentucky's overdose fatalities, which were already high, increased dramatically in 2015. Overdose deaths of Kentucky residents, regardless of where the death occurred, and non-residents who died in Kentucky, numbered 1,249 in 2015.

6.      In 2015, drug overdoses accounted for 51.17% of Kentucky's statewide accidental deaths, more than motor vehicle accidents, fire, drowning and gunshot wounds combined. In 2015, opioids accounted for 46.63% of the statewide total of drug related fatal overdose victims. In 2016, the number of deaths statewide due to drug overdoses was nearly five-times that of car accidents.

7.      Opioid abuse has reached epidemic levels in Kentucky. From February 1, 2016, to January 31, 2017, pharmacies in Kentucky filled prescriptions for 307,234,816 doses of prescription opioids—the equivalent of 69 doses for every man, woman, and child residing in Kentucky.

8.      The progression from prescription opioids to the use of illicit drugs, particularly injectable heroin, is well documented, with approximately 75% of heroin users reporting that their initial drug use was through prescription. As Kentucky citizens who become addicted to prescription opioids have predictably migrated to illicit, but less expensive, opioids, namely heroin and fentanyl, overdoses have dramatically increased. The opioid-overdose reversal drug naloxone was administered in four out of every seven Emergency Medical Services runs; and on average, seven response calls per day were to drug-related incidents.

9.      Opioids have endangered public health in Kentucky even beyond addiction and overdose. Addicts who are not killed by drug addiction experience a variety of health

consequences (including non-fatal overdoses) and engage in a variety of risky drug-seeking behaviors. Widespread drug addiction imposes costs on the community including health care and substance abuse treatment costs – a substantial portion of which were provided by Plaintiffs – as well as other costs borne by their respective cities.

10.    Kentucky's children have been especially vulnerable to the opioid epidemic. Along with overdose deaths, the number and rate of neonatal abstinence syndrome ("NAS") – a condition suffered by babies born to mothers addicted to opioids – has also increased dramatically in Kentucky. Kentucky has had one of the highest rates of pregnant women using opioids in the country.

11.    In 2014, Kentucky had the third-highest rate of pregnant women with opioid use disorder. In just one 12-month period, between August 1, 2014 and July 31, 2015, 1,234 infants in Kentucky were born addicted to opioids, more than 100 newborns per month. The number of NAS cases in Kentucky totaled 1,115 in 2016 based on hospital discharge data. In 2017, the number of babies born with NAS in Kentucky had increased by 375% since 2007.

12.    These infants will spend weeks in neonatal intensive care units while they painfully withdraw from the drugs – a process so painful that it traps many adults on opioids. Research has indicated that these children are likely to suffer from continued serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening.

13.    The widespread use of opioids and corresponding increases in addiction and abuse have led to increased emergency room visits, emergency responses to overdoses, and emergency medical technicians' administration of naloxone—an antidote to opioid overdose. In Louisville, the police force administered 123 doses of naloxone in just the first six weeks of

- 3 -

2017— representing approximately three overdoses each day. It also has resulted in dramatic growth in drug-related crimes. There have been increases in domestic violence, robberies, burglaries, and thefts, among other crimes across Kentucky. An estimated 90% of defendants in Floyd County are prosecuted for crimes related to prescription drug abuse or diversion.

14.     Kentucky has seen an increase in blood borne diseases caused by intravenous drug use, including hepatitis C (HCV) and human immunodeficiency (HIV). Intravenous use of opioids, which has been a particular problem with easy-to-inject Opana ER, has led to a surge in HCV in the state and created a risk of an even broader epidemic. Kentucky and other states in the central Appalachian region of the country experienced a 364% increase in reported acute HCV among individuals aged 30 years old or below between 2006 and 2012.

15.     Among the 220 U.S. counties identified by CDC as the most vulnerable to HIV and HCV infections among people who inject drugs in the context of the national opioid epidemic, 54 were located in Kentucky, including Wolfe County, which had the greatest risk in the United States.

16.     Kentucky had the highest rate of new hepatitis C infections in the nation—more than six times the national average—from 2008 through 2015. St. Elizabeth Healthcare in Edgewood reports that it sees up to ten new cases of hepatitis C daily. If untreated, hepatitis C continues to be transmitted, including in childbirth. Hepatitis C can ultimately cause liver cancer, fibrosis, or cirrhosis, and is the leading cause of liver transplants in the country.

17.     Over the last decade, eastern Kentucky has lost over 11,000 coal mining jobs, according to the Kentucky Department of Energy. When the mining industry plummeted, other local businesses were also forced to close. The collapse of the coal industry forced many of the town's residents into joblessness and triggered a sense of hopelessness, which exacerbated the

opioid crisis in the region. Abuse of prescription pain medication is especially widespread among the growing ranks of out-of-work miners, who were often prescribed opioid medications to deal with the rigors of the job.

18.     Across Kentucky, families and communities face heartbreaking tragedies that cannot be adequately conveyed by statistics, and they have faced them all too often. Many grieving families have been financially tapped out by the costs of repeated cycles of addiction treatment programs; others have lost hope and given up. The increasing number of cases takes both a physical and mental toll on investigators, first-responders, and ultimately the public at large—the Plaintiffs.

**B.     The National Opioid Crisis—Epidemic.**

19.     The United States is in the midst of an opioid epidemic caused by the Defendants', *see infra*, collective and individual unlawful marketing, sale, distribution, and dispensing of prescription opioids that has resulted in addiction, criminal activity, serious health issues, and the loss of life.

20.     The United States constitutes 4.6% of the world's population but consumed 80% of the world's opioid supply in 2011. According to the Centers for Disease Control and Prevention ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.

21.     It is undisputed that opioids are both addictive and deadly. Between 1999 and 2014, more than 165,000 Americans died of opioid overdose. Deaths related to opioids are accelerating. In 2011, the CDC declared that prescription opioid deaths had reached "epidemic levels." That year, 11,693 people died of prescription opioid overdoses. Since then, prescription opioid deaths have more than quadrupled, reaching 47,600 Americans in 2017— more than ten

times the number of Americans who died in the entire Iraq War.

22.     According to the CDC, opioid overdoses killed more than 45,000 people, nationally, over a 12-month timeframe that ended in September 2017. It is already the deadliest drug epidemic in American history. If current trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.

23.     The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications." In many cases, heroin abuse starts with prescription opioid addiction. An inflated volume of opioids invariably leads to increased diversion and abuse. Indeed, there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."

24.     For most people who misuse opioids, the source of their drugs can typically be found in the excess supply of drugs in the community, beyond what is needed for legitimate medical purposes. Filling an opioid prescription is a significant risk factor for overdose.

25.     According to the CDC, the United States is currently seeing the highest overdose death rated ever recorded. Aside from overdose, long-term opioid use is associated with a significant increase in mortality from other causes. As opioid-related deaths increase, the life expectancy in the United States decreases.

26.     On October 28, 2017, the President of the United States declared the opioid crisis a public health emergency.

**C.     This Lawsuit and the Plaintiffs'—Kentucky Home Rule Cities—Claims.**

27.     The Plaintiffs, comprised solely of Kentucky Home Rule Cities, bring this lawsuit to eliminate the hazard to public health and safety caused by the opioid (defined as all opiate

- 6 -

drugs whether natural, synthetic, or semi-synthetic) epidemic, to abate the nuisance caused

thereby, and to recoup monies that have been spent because of Defendants' individual and

collective false, deceptive and unfair marketing and/or unlawful diversion of prescription

opioids. Such economic damages were foreseeable to Defendants and were sustained because of

Defendants' wanton, reckless, intentional and/or unlawful actions and omissions.

### 1.    The Opioid Manufacturers.

28.    This lawsuit is focused on the primary cause of the opioid crisis: the false and

misleading marketing scheme in which the Defendants joined and conspired to dramatically

increase the demand for and sale of opioids throughout the Commonwealth of Kentucky.

29.    The Defendants who manufacture, market, promote, and sell prescription opioids

precipitated this crisis. These opioids have various brand names and generic names, and include

OxyContin, fentanyl, hydrocodone, oxycodone, among others. Through a massive marketing

campaign premised on false and incomplete information, these Defendants engineered a dramatic

shift in how and when opioids are prescribed by the medical community and used by patients.

30.    To increase the potency, and corresponding demand for opioids, the Defendants

who manufacture opioids sought to first develop a "better" opioid pain-killer—similar to Big

Tobacco's spiking the nicotine content in cigarettes, the manufactures spiked the efficacy of the

opioids.

31.    The manufactures then orchestrated a campaign of misinformation—a relentless

and methodical plan to dramatically and exponentially increase their respective sales and

profits—to broaden and deepen the market and demand for opioids. This campaign hinged on

convincing the medical community (i) that opioids should be used not just for acute care, but

also for chronic pain; and (ii) that opioids were not addictive—they were low risk. This

campaign was predicated on a systemic and calculated lie.

32.     The manufacturers knew that opioids were _not_ appropriate for long-term use and, more importantly, that they were extremely addictive. Again, the manufacturers sought to benefit from this addictive feature by increasing the efficacy of the opioids—creating a dependent client for life.

33.     Studies have found diagnosed opioid dependence rates in primary care settings as high as 26%. Among opioid users who received four prescriptions in a year, 41.3% meet diagnostic criteria for a lifetime opioid-use disorder. Because opioids cause tolerance and dependence, patients who take the drugs for even a short time become a physiologically captured market.

34.     According to the U.S. Department of Health and Human Services, more than two million Americans are now opioid-dependent. The difficulty in stopping use is particularly true for patients first prescribed an extended release opioid. Patients who initiated treatment on an extended release opioid – such as OxyContin – have a 27.3% likelihood to be using opioids one year later, and a 20.5% likelihood of using opioids three years later. Whether in the end a patient meets the clinical definition of addiction or is simply dependent and unable to stop using opioids, once opioids are prescribed for even a short period of time, patients are hooked.

35.     Opioids pose high risks for children and adolescents. Most of the use in this population is off label because opioids are _not_ approved for children. Use of prescription opioid pain medication before high school graduation is associated with a 33% increase in the risk of later opioid misuse. The misuse of opioids in adolescents strongly predicts the later onset of heroin use. Nonetheless, the 2016 CDC guidelines found that there have been significant increases in opioid prescribing for children and adolescents, for conditions such as headaches

and sports injuries.

36.    Again, the manufacturers goal was simple: dramatically increase sales by (i) increasing the potency; and (ii) convincing doctors to prescribe opioids not only for acute pain (e.g. cancer or short-term post-operative pain), but also for common chronic pain (e.g. back pain and arthritis). They did this even though they knew that opioids were highly addictive and subject to abuse, and that their claims regarding the risks, benefits, and superiority of opioids for long-term use were patently false and misleading.

## 2.    The Distributors and Pharmacies– the Suppliers.

37.    The opioid distributors and retail pharmacies comprised the suppliers who, recognizing and being driven by the significant profits from the distribution, sale and dispensing of opioids, willfully and knowingly disregarded their duties under Kentucky law—resulting in the flood of opioids throughout the Commonwealth of Kentucky that precipitated the opioid epidemic.

38.    The suppliers, through their willingness to uncritically supply whatever quantities of opioids pharmacies ordered and fill prescriptions without scrutiny or hesitation, normalized overprescribing and caused widespread proliferation and availability of these dangerous drugs throughout communities in the Commonwealth.

39.    The sharp increase in opioid use resulting from Defendants' conduct has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the Commonwealth.

40.    The suppliers' practice of continually filling, and refilling, opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities throughout the Commonwealth.

41.    The suppliers—in particular the distributors—had significant financial incentives to distribute higher volumes of opioids and not to report suspicious orders or guard against diversion. Wholesale drug distributors acquire opioids from the manufacturers at an established wholesale acquisition cost. Discounts and rebates are generally offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors which in turn allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.

## JURISDICTION & VENUE

42.    This Court has subject matter jurisdiction over the claims asserted in this lawsuit pursuant to Kentucky Revised Statutes 23A.010. Plaintiffs' claims do *not* fall within Kentucky Revised Statutes 24A.120. The amount in controversy *exceeds* five thousand dollars ($5,000), exclusive of interest and costs.

43.    Venue is proper in this Court. Defendants' individual and collective actions forming the basis for Plaintiffs' claims occurred throughout the Commonwealth of Kentucky, as well as in Franklin County. Defendants' agents are registered with, and located in, Franklin County.

44.    This action is *not* removable to federal court for many reasons, including inter alia: (i) a lack of complete diversity of citizenship; (ii) the claims asserted herein arise solely under Kentucky's laws and regulations; (iii) no claims are asserted under any federal law or regulation, and any inference to the contrary is expressly disavowed; and (iv) the claims asserted herein are solely on behalf of Kentucky Home Rule cities—all within the Commonwealth of Kentucky.

45.    This action is similarly *not* removable to federal court under the Class Action

Fairness Act for many reasons, including, inter alia: (i) the class is comprised of _less than_ 100

Kentucky Home Rule cities; (ii) _more than_ two-thirds—in fact all—of the Plaintiffs are

Kentucky citizens; (iii) the Plaintiffs seek significant relief from _no less than_ three (3)

Defendants who are Kentucky citizens and whose conduct—individually and collectively—

occurred in Kentucky and form the basis of Plaintiffs' claims—also asserted under Kentucky

law.

46.     Both general and personal jurisdiction apply to each Defendant named herein.

Each Defendant purposely availed themselves of the privilege of seeking and doing business in

the Commonwealth of Kentucky—reaping billions of dollars in profits at the expense of the

Plaintiffs. Given the foregoing, as well as the Defendants' respective obligations to comply with

Kentucky's licensing and permit requirements for the manufacture, distribution, sale, and

dispensing of opioids, Defendants should have anticipated being "haled" into this Court to

answer for their illicit and improper activities.

## PARTIES

**A.      Plaintiffs—Kentucky Home Rule Cities.**

47.     Plaintiff **City of Henderson, Kentucky** ("Henderson") is a Kentucky Home Rule

City governmental entity authorized, and entrusted with, protecting the public health, safety, and

welfare of its residents. _See_ e.g. KRS 81.005(1). As a Home Rule city, Henderson's mandate

includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating

to Defendants' individual and collective actions in their improper, reckless, willful, and wanton

distribution of opioid drugs throughout Henderson.

48.     Henderson brings this action on its behalf, and on behalf of all other Kentucky

Home Rule cities (collectively the "**Plaintiffs**"). _See e.g._ CR 23. The Plaintiffs include all

similarly situated Kentucky Home Rule cities with populations in exceeding four thousand (4,000), and who have *not* filed a civil action and/or do *not* have a civil action pending in the National Prescription Opiate Litigation MDL 2804.[1]

49.     Plaintiffs have declared that opioid abuse, addiction, morbidity and mortality has created a serious and significant public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market caused or contributed to this public nuisance, both in the past and continuing into the foreseeable future. The distribution and diversion of opioids into and throughout the Commonwealth of Kentucky, and into Plaintiffs' respective city, created this foreseeable opioid crisis and opioid public nuisance for which Plaintiffs seek all available relief.

**B.     Defendants.**

50.     All of the actions described herein were part of, and in furtherance of, the unlawful manufacture, promotion, marketing, distribution, sale, and dispensing of opioids throughout the Commonwealth of Kentucky, and were:

- authorized, ordered, and/or performed by Defendants' respective alter-egos, subsidiaries, officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment; and/or

- with Defendants' respective actual, apparent, and/or ostensible authority.

51.     The true name, identity, and capacity of Defendants' respective alter-egos, subsidiaries, officers, agents, employees, or other representatives, including and capacities, whether individual, corporate, associate, are presently unknown to Plaintiff and the Plaintiff Class (collectively the "Plaintiffs").  Plaintiffs therefore reserve the right to amend this complaint

---

[1]   Plaintiffs' proposed class definition is provided further herein.

where, and as, necessary to obtain full and complete relief for their claims from all those responsible.

### 1.   Manufacturing ("Marketing") Defendants.

52.   The Manufacturing ("Marketing") Defendants are defined below. At all relevant times, the Manufacturing ("Marketing") Defendants have manufactured, promoted, marketed, distributed, and sold opioids throughout the Commonwealth of Kentucky—activities which have failed to comply with their legal obligations to their patients and to the public at large.

### a.   Purdue Entities.

53.   Defendant **Purdue Pharma L.P.** is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Connecticut.

54.   Defendant **Purdue Pharma Inc.** is a New York corporation with its principal place of business in Stanford, Connecticut, and is the general partner of Purdue Pharma, L.P.

55.   Defendant **Purdue Frederick Company** is a Delaware corporation with its principal place of business in Connecticut.

56.   Defendants Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company (collectively the "**Purdue Entities**") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

57.   At all relevant times, the Purdue Entities manufactured prescription opioids, including OxyContin, MS Contin, Dilaudid, Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER, which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

58.   OxyContin is the Purdue Entities' best-selling opioid. Since 2009, Purdue's annual nationwide sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion—

reflecting a 350% increase from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

59.    In furtherance of their opioid promotions, marketing, and resulting sales, the Purdue Entities made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, many of whom were not oncologists and did not treat cancer pain, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

60.    The Purdue Entities' misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### b.    Rhodes Entities.

61.    Defendant **Rhodes Technologies** ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

62.    Defendant **Rhodes Technologies Inc.** ("RTI") is a Delaware corporation formed January 28, 1999 with its principal place of business in Coventry, Rhode Island.  RTI is a general partner of Rhodes Tech. At relevant times, RTI has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

- 14 -

63. Defendant **Rhodes Pharmaceuticals L.P.** ("Rhodes Pharma") is a Delaware limited partnership formed on November 9, 2007 with its principal place of business in Coventry, Rhode Island.

64. Defendants Rhodes Tech, RTI, and Rhodes Pharma (collectively the "**Rhodes Entities**") acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

65. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin which is manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership, which is a subsidiary of Defendant PPLP and which owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

66. At all relevant times, the Rhodes Entities manufactured a generic form of OxyContin, which was in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

67. In furtherance of its opioid promotions, marketing, and resulting sales, the Rhodes Entities made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

68. The Rhodes Entities' misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### c.    Sackler Defendants.

69.    The following Defendants, all members of the Sackler family that beneficially own Purdue, have served on the Board of Purdue and directed the activities of Purdue during the relevant times as follows:

- **Richard Sackler** (all relevant times until 2018), a resident of Florida;

- **Beverly Sackler** (all relevant times until 2017), a resident of Connecticut;

- **David Sackler** (2012-18), a resident of New York;

- **Ilene Sackler Lefcourt** (all relevant times), a resident of New York;

- **Jonathan Sackler** (all relevant times), a resident of Connecticut;

- **Kathe Sackler** (all relevant times), a resident of Connecticut;

- **Mortimer D.A. Sackler** (all relevant times), a resident of New York; and

- **Theresa Sackler** (all relevant times until 2018), a resident of the United Kingdom.

70.    The foregoing Defendants (collectively, the **"Sackler Defendants"**) controlled, directed, and were responsible for Purdue's misconduct as detailed in this complaint. Each of them willingly accepted and took a seat on the Board of Directors of Purdue Pharma Inc. Based on their active and coordinated efforts, the Sackler Defendants held the controlling majority of the Board of Directors of Purdue Pharma Inc.

71.    The Sackler Defendants' control of Purdue's Board also provided them with full power and control over Purdue Pharma Inc. and Purdue Pharma L.P. The Sackler Defendants exercised their complete control to direct and to orchestrate a systemically deceptive sales and marketing plan to exponentially increase the sale of opioids—e.g. OxyContin manufactured by the Purdue entities, and its generic version manufactured by the Rhodes entities.

72.    The Sackler Defendants' complete direction and control—of the Purdue Entities and the Rhodes Entities—included overseeing and directing the actions of executives and sales employees.  From the money the Purdue Entities and the Rhodes Entities Purdue gleaned from their deceptive promotional, marketing, and sales initiatives, the Sackler Defendants reaped billions of dollars in personal profits.

73.    The Sackler Defendants, at all pertinent times, constituted a majority of the Board, which gave them full power and control over the Purdue Entities and the Rhodes Entities—including control of the minutiae of the daily activities.  To be clear, the Sackler Defendants exercised complete control over, and direction in, the Purdue Entities' and the Rhodes Entities' fraudulent manipulation of the public discourse including orchestrating the deceptive promotional, marketing, and sales practices that led to the opioid epidemic—again, for their own personal enrichment at the expense of the Commonwealth of Kentucky.

74.    While the Sackler Defendants relinquished their officer titles around 2003, they did not relinquish their complete control and orchestrated efforts.  They simply sought to shield themselves from future criminal and civil liability for their actions by hiding behind a corporate shell game.  Regardless, the Sackler Defendants did not forgo their ownership of the Purdue Entities and the Rhodes Entities—they continued to aggressively pursue their own personal wealth at the expense of the public.  To that end, the Sackler Defendants retained full power and complete control of the Purdue Entities and the Rhodes Entities board of directors.

75.    In furtherance of their greed, and at all relevant times through at least the end of 2018, the Sackler Defendants continued to exercise their complete dominance and control over deceptive promotion, marketing, and sales campaigns for the Purdue Entities and the Rhodes Entities.  They directed the hire of hundreds more sales representatives to visit doctors thousands

- 17 -

more times—continuing to knowingly spread misinformation concerning opioid use in a

desperate effort to obtain every possible dollar of profit before their fraudulent endeavor was

shut-down by civil litigation and/or criminal action.

76.     Notably, the Sackler Defendants insisted that sales representatives repeatedly visit

the most prolific prescribers. They directed sales representatives to encourage doctors to

prescribe more of the highest doses of opioids. They studied unlawful tactics to keep patients on

opioids longer and then ordered staff to use them. They required staff provide detailed reports

about doctors suspected of misconduct, how much money the Purdue Entities and the Rhodes

Entities made from them, and how few of them the Purdue Entities and the Rhodes Entities had

reported to the authorities. Because the Sackler Defendants demanded much more detail, staff

had to create special reports just for them.

77.     Examples of the Sackler Defendants direct efforts and control over the Purdue

Entities, and subsequently the Rhodes Entities included the following:

- Defendant Richard Sackler even went into the field to directly promote opioids to doctors and supervise representatives face to face.

- In connection with a single meeting in 2011, sales and marketing staff scrambled to prepare responses to questions from the Sackler Defendants, Defendant Mortimer Sackler asked about launching a generic version of OxyContin to capture more cost sensitive patients.

- Defendant Kathe Sackler recommended looking at the characteristics of patients who had switched to OxyContin to see if Purdue could identify more patients to convert.

- Defendant Jonathan Sackler demanded reports on the changes in market share for opioids, focusing on dose strength, so as to increase sales and profits.

- Russell Gasdia, Vice President of Sales and Marketing for the Purdue Entities, complained to the then CEO about the Sackler Defendants' invasive control and interference with sales activities: "Anything you can do to reduce the direct contact of Richard [Sackler] into the